**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION**


**ASSOCIATION CASUALTY INSURANCE COMPANY;
BENCHMARK INSURANCE COMPANY; GEORGIA
CASUALTY & SURETY COMPANY; and NATIONAL
SECURITY FIRE and CASUALTY COMPANY**         **PLAINTIFFS**


**VERSUS**            **CIVIL ACTION NO. 3:07cv525KS-JCS**


**ALLSTATE INSURANCE COMPANY; FARM BUREAU
MUTUAL INSURANCE COMPANY; NATIONWIDE MUTUAL
FIRE INSURANCE COMPANY d/b/a NATIONWIDE
INSURANCE COMPANIES; STATE FARM FIRE AND
CASUALTY COMPANY; ST. PAUL TRAVELERS COMPANIES;
LORRIE K. BROUSE; ROBERT P. ARNOLD; DELMA P. LOCKE, JR.;
TERRY BLALOCK; CHARLES RICE; and BRAD LITTLE**      **DEFENDANTS**


## MEMORANDUM OPINION AND ORDER

This matter is before the court on Motion for Class Certification **[#168]** filed on

behalf of the plaintiffs pursuant to Rule 23, Federal Rules of Civil Procedure.  The court,

having reviewed the motion, the response, the briefs of counsel, the authorities cited

and being otherwise fully advised in the premises, finds that the motion is not well taken

and should be denied.


## FACTUAL BACKGROUND

This purported class action is brought by the named plaintiffs as representatives

on behalf of more than one hundred insurance companies against the insurance-

company members of the Mississippi Windstorm Underwriting Association"s ("MWUA"

or "the Association") Board of Directors and their individual representatives (collectively, "the defendants"). The plaintiffs are insurance companies who challenge the amount of reinsurance purchased by the Board for the 2004 and 2005 hurricane seasons. They allege that a conflict of interest led the defendants to dramatically under reinsure risks the Association covered with respect to some of the most vulnerable properties in the Mississippi Coast Area. As a result, the Association's members suffered more than $525 million in unreinsured losses in the wake of Hurricane Katrina.

The lynchpin of the plaintiffs' argument for class certification is that the Board's decision regarding the amount of reinsurance to purchase allegedly was tainted by self-dealing, in that the Board members had a financial incentive to under-reinsure the MWUA's risks.

To redress the injuries allegedly caused by the defendants' alleged self-interested decisions, the plaintiffs have brought claims for breach of fiduciary duty, negligence, and declaratory judgment on behalf of a class of over 100 of the Association's non-director members. The plaintiffs assert that common questions relating to the defendants' alleged self-dealing conduct predominate over questions unique to individual class members. Further, the plaintiffs contend that their claims are typical of the class they purport to represent and that the plaintiffs and their attorneys will zealously represent all class members. Finally, the plaintiffs argue, that a class action in this matter presents great efficiencies when compared with individual actions.

The defendants respond by stating that the plaintiffs' self-dealing theory is based on their erroneous assertion of how the costs of reinsurance were charged to the MWUA's members. The plaintiffs allege in the Complaint that the defendant companies

should have borne a large share of the costs of the MWUA's reinsurance and so had a financial incentive to keep that cost down. However, the defendants point to the Plan governing the Association which allows certain credits to companies who voluntarily write substantial amounts of insurance on the Coast thus allowing them to avoid the costs of reinsurance. The defendants contend that most of the defendant companies — as well as many other companies who themselves voluntarily wrote a substantial amount of coverage on the Coast — bore none of the costs of reinsurance and therefore had no incentive to under-reinsure.

Further, the defendants contend that under the terms of the Plan, had more reinsurance been purchased, the defendant insurers' assessment for Katrina losses by the MWUA would have actually been reduced below what they were. Thus, according to the defendants, the plaintiffs' arguments for commonality, typicality and predominance evaporate.

## THE MISSISSIPPI WINDSTORM UNDERWRITING ASSOCIATION

The Association was created by the Mississippi Legislature as an insurer of last resort "to assure an adequate market for windstorm and hail insurance in the coast area of Mississippi." 1987 Miss. Laws, ch. 459, § 1. Its membership is comprised of "[a]ll insurers authorized to write and engaged in writing property insurance within this state on a direct basis." Miss Code. Ann. § 83-34-5. Membership in the Association is mandatory. *Id.* Thus, under Mississippi law, every property insurer "shall be a member of the association . . . as a condition of its authority to continue to transact the business of insurance in [Mississippi]." *Id.*

3

Consistent with this Legislative intent, the MWUA operates pursuant to a Plan of Operation that was approved by the Commissioner of Insurance and lists its purpose as:

> 1. To provide an adequate market for windstorm and hail coverage which is necessary to the economic welfare of the Coast area in order to insure its orderly growth and development.

> 2. To provide adequate insurance upon property in the Coast area which is necessary to enable homeowners and commercial owners to obtain financing for the purchase and improvement of their property.

> 3. To provide an equitable method whereby every licensed insurer writing Windstorm and Hail coverage in Mississippi is required to meet its public responsibility.

> 4. To provide a mandatory Plan to assure an adequate market for Windstorm and Hail Coverage in the Coast area of Mississippi and to fulfill the Purposes provided by the Mississippi Legislature.

(Plan of Operation and Articles of Agreement (the "Plan"), § 1, attached as Ex. 1 to the defendants' Response.) For almost two decades, the MWUA has made windstorm and hail insurance available to residents of the coastal counties of Mississippi who otherwise would not have been able to obtain such insurance in the normal insurance market. The Plan defines the "Coast Area" as "that area of the State of Mississippi located in Hancock, Harrison, Jackson, Pearl River, Stone and George Counties." (Plan, § II(6)).

All members of the Association participate in the MWUA's writings, expenses, profits, and losses in the proportion that the net direct premiums for wind and hail insurance written by each such member bears to the aggregate net premiums written in the state by all MWUA members. Miss. Code Ann. § 83-34-9 (Supp. 2006). Specifically,

all members of the MWUA participate in the first 10% of the losses in the amount of their pro rata share of the total premiums written in the state. (Plan § IX(2)).  Each member's share of the remaining 90% of losses is determined based on credits, if any, that members receive for voluntarily writing windstorm and hail insurance in the Coast Area.  Thus, depending on how much voluntary insurance a member writes, a member's 90% share can be reduced to zero.  (*Id.*)  Each member's participation in the 90% share of losses is determined annually. (*Id.*)

The MWUA is operated and managed by specialized staff of the Mississippi State Rating Bureau.  The Plan vests the administration of the business affairs and activities of the MWUA with its Board of Directors, "subject to review of the Commissioner." (Plan § XI(1).)  The Commissioner directly appoints the members of the Board, which consists of a member of his own staff, three independent agent directors, and five representatives of member companies. (*See, e.g., id.*; §§ XI (2), XII (10)).  As contemplated by the Plan, representatives of the Mississippi Department of Insurance attend MWUA Board meetings.

In order to ensure that the MWUA fulfills its public purpose, the statutes authorize the Commissioner to examine the affairs of the MWUA and require it, "at any time," to furnish him with additional information with respect to "any other matter which the [C]ommissioner deems to be material to assist him in evaluating the operation and experience of the association" and to file a statement summarizing the transactions, operations, and affairs of the MWUA with the Commissioner each year.  Miss. Code Ann. §§ 83-34-25, 83-5-209(3) (Supp. 2006); Plan § XIII (3).  By statutory design, the Commissioner can review any decision of the MWUA through a formal administrative

process.  Under the appeal process, "[a]ny … affected insurer who may be aggrieved by an act, ruling or decision of the association may, within thirty (30) days after such ruling, appeal to the commissioner."  Miss. Code Ann. § 83-34-19 (Supp. 2006).

In 2004 and 2005, the relevant time period for this case, the MWUA was administered by an eight-member Board, comprised of three independent insurance agents (who have not been sued) plus an employee of each of the defendants Allstate, Mississippi Farm Bureau, Nationwide, State Farm and St. Paul Travelers, along with a member of the Commissioner's staff, who served as a non-voting member.  In administering the Plan, the Board is charged with the following specifically enumerated and discrete duties:

> 1. The Board shall meet as often as may be required to perform the general duties of the administration of the Plan or on the call of the Commissioner. Five members of the Board shall constitute a quorum.
>
> 2. The Board shall be empowered to contract with Servicing Insurers and provide reimbursement for all costs and expenses incurred by such Servicing Insurers; to appoint or otherwise contract for the services of a Manager and an Attorney; to approve expenses; levy assessments including preliminary assessments; disburse funds and perform all other duties provided herein or necessary or incidental to the administration of the Plan. Assessments upon each insurer shall be levied on the basis of its net direct premiums written.
>
> 3. The Board shall furnish to the Commissioner a written report of operation for the preceding fiscal year ending December 31st annually on or before March 1st in such form and detail as the Commissioner may determine. A copy of such report shall be furnished to all insurers.
>
> 4. The Board of Directors of the Association may, subject to the approval of the Commissioner, amend the Plan of Operation at any time.

(Plan, § XIII).

The MWUA began purchasing reinsurance in 1990 and typically reviewed these purchases on an annual basis.  When it came time to review the reinsurance in force in

2004, the Board began by hearing presentations from four insurance brokerage firms, Aon RE, Inc. ("Aon"), Guy Carpenter & Company, Inc. ("Guy Carpenter"), Benfield, Inc. ("Benfield"), and CRC Insurance Services, Inc. ("CRC") (which had served as the MWUA's reinsurance broker in recent years). Those presentations included what are alleged to have been state-of-the-art catastrophe models that estimated the MWUA's "probable maximum losses" in different scenarios.

After reviewing the recommendations from the insurance brokers, the Board in 2004 unanimously decided to purchase $175 million in reinsurance per catastrophe, above a $10 million layer of retained losses, for the years 2004 and 2005. This meant that the MWUA was reinsured up to the level of $185 million per catastrophe, such as a hurricane. The defendants assert that, based on the presentations from the brokers, and the then-state-of-the-art computerized catastrophe models, this level of reinsurance was generally adequate to reinsure to between a one-in-100-year and one-in-250-year hurricane. The plaintiffs contend that at least one broker, and possibly more, recommended that the Board reinsure to a one-in-500-year event.

The plaintiffs allege that the defendants made these reinsurance decisions while under a conflict of interest. To support this argument, they point out that the Association's Plan of Operations requires all the Association's members to participate in the Association's expenses in proportion to the net direct premiums they collect for the hail and windstorm insurance they write in Mississippi. (Plan § IX(2)). They allege that reinsurance is an expense of the Association for which the five defendant insurance companies were responsible for more than 54% of during the relevant time period. The defendants agree that the members are required to participate in the Administrative

Expenses of the Association but they contend that reinsurance is not such an expense. Thus, according to the defendants, because of credits received for voluntarily writing insurance on the Coast, they were actually not required to participate in the expense of purchasing reinsurance, thus making the plaintiffs' claim of self-dealing vanish.

## **STANDARD OF REVIEW**

The question of class certification is a procedural one distinct from the merits of the action. *See Huff v. N. D. Cast Co.*, 485 F.2d 710 (5th Cir. 1973); and *Miller v. Mackey International, Inc.*, 452 F.2d 424 (5th Cir. 1971). The burden of proving that a class action is the appropriate vehicle for resolving these claims rests with the party seeking certification. *See EEOC v. D. H. Holmes Co., Ltd.*, 556 F.2d 787 (5th Cir. 1977), *cert. denied*, 436 U.S. 962 (1978); and *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479-80 (5th Cir. 2001). *See also, Castano v. American Tobacco Co.,* 84 F.3d 734, 740 (5th Cir. 1996)(citing *Horton v. Goose Creek Independent School Dist.*, 690 F.2d 470, 486 (5th Cir.1982), *cert. denied*, 463 U.S. 1207, 103 S.Ct. 3536, 77 L.Ed.2d 1387 (1983); and *In re American Medical Systems, Inc.*, 75 F.3d 1069, 1086 (6th Cir.1996)).

In order for plaintiffs to meet this burden, they must demonstrate, as all potential class action plaintiffs must, that the action satisfies each of the four prerequisites under Rule 23(a), *i.e.*, numerosity, commonality, typicality, and representativeness.[1] *Mullen v.*

---

[1] Rule 23(a) provides,
> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative party will fairly and adequately protect the interest of the class.

*Treasure Chest Casino*, 186 F.3d 620, 623 (5th Cir. 1999). After meeting the requirements of 23(a), the plaintiffs must show that the action further qualifies under at least one of the three categories of Rule 23(b).[2] *See Langebecker v. Electronic Data Systems, Corp.*, 476 F.3d 299, 306-307 (5th Cir. 2007; and *Alabama v. Blue Bird Body Co., Inc.*, 573 F.2d 309, 315 (5th Cir. 1978). The court is required to "conduct a rigorous analysis of the rule 23 prerequisites." *Castano,* 84 F.3d at 740, (citing *General Telephone Co. of Southwest. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982); and *Applewhite v. Reichhold Chemicals, Inc.*, 67 F.3d 571, 573 (5th Cir.1995)).

---

[2] Rule 23(b) provides:
(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

## REQUIREMENTS OF RULE 23(a)

### Numerosity

The numerosity requirement of Rule 23(a)(1) states "the class is so numerous that joinder of all members is impracticable."  In discussing numerosity the concern would seem to be with the number of anticipated plaintiffs.  However that is not the case.  Even though the numerosity requirement is to be applied to each case based on the specific facts of each case, the rule imposes no absolute limitations.  *General Telephone Co. v. Equal Employment Opportunity Commission*, 446 U.S. 318 (1980).  Likewise, there are no steadfast rules controlling the number of class members required to satisfy Rule 23(a).  "The basic question is practicability of joinder, not number of interested persons per se."  *Garcia v. Gloor*, 618 F.2d 264, 267 (5th Cir. 1980).  The Fifth Circuit continued in *Garcia*, "practicability of joinder depends on size of the class, ease of identifying its members and determining their addresses, facility of making service on them if joined, and their geographic dispersion."  *Id.*, at 267.

The plaintiffs assert that the class they propose for certification is sufficiently numerous that joining all the absent class members in this action would not be practical.   The proposed class is slightly over 100 members.  To support their contention that joinder of the putative class members is impractical, the plaintiffs rely on the finding of the Fifth Circuit that a class with "100 to 150 members" is "within the range that generally satisfies the numerosity requirement."  *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999), *cert. denied*, 528 U.S. 1159, 120 S. Ct. 1169, 145 L.Ed.2d 1078 (2000).  However, the *Mullen* court approved the class of 100 - 150 members while noting that the district court had found other factors which

supported its finding of numerosity. Those factors included the transient nature of employment in the gambling business and the likelihood, that some of the putative class members were geographically dispersed and unavailable for joinder and that some of the putative class members were still employed by the Casino and might be reluctant to file individually for fear of workplace retaliation. *Mullen*, 186 F.3d at 624. Those factors are not present here.

The names and locations of all of the putative class members are well known to all parties in this case. The proposed class members are each required to register with the Commissioner of Insurance for the State of Mississippi as a condition of doing business here, and, as pointed out above, they are each required to become a member of the Association. Where the identities and addresses of the proposed class members are easily ascertainable, the practicability of joinder is increased. *See Garcia,* 618 F.2d at 367. *See also, Bourdais v. City of New Orleans*, 1999 WL 729249 (E.D.La.,1999).

The defendants have also argued that several of the absent putative class members have been contacted by the plaintiffs in this action in an effort to encourage them to join the litigation. To date, none have chosen to voluntarily join. To the contrary, one named plaintiff was given a voluntary dismissal at an earlier stage in this litigation, when, according to the defendants, it decided that pursuit of this litigation was not economically advantageous.

Therefore, the court finds that the plaintiffs have not met their burden of showing that the number of putative class members is so numerous as to make their joinder impracticable. The court makes this finding even though the defendants do not contest the numerosity issue. While the failure of the plaintiffs to show numerosity proves fatal

to the proposed class, there are other problems with allowing this case to proceed as a class action which the court will discuss in turn.

**Commonality**

Rule 23(a)(2) provides that certification is proper only where "there are questions of law or fact common to the class."  The commonality requirement is met if there are sufficient questions of law or fact common to the class representative and the putative class members.  The test for commonality is not demanding and is met "where there is at least one issue, the resolution of which will affect all or a significant number of the putative class members." *Lightbourn v. County of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997).  To satisfy this requirement, "[t]he interests and claims of the various plaintiffs need not be identical.  Rather, the commonality test is met when there is 'at least one issue whose resolution will affect all or a significant number of the putative class members.'" *Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1106 (5th Cir. 1993).  The threshold for commonality—as the Fifth Circuit has recognized—is "not high." *Id.*

The plaintiffs argue that in this matter, the resolution of whether the defendants' alleged self-dealing conduct with respect to the purchase of reinsurance prior to Hurricane Katrina violated the defendants' legal duties to the plaintiffs would affect all members of the proposed class.   Further, the court concludes that issues relating to whether the defendants even owed a fiduciary duty to the plaintiffs would be common to all members.  The defendants do not contest that there are sufficient issues of law or fact that are common to the proposed class so as to satisfy the commonality requirement.  Thus, the plaintiffs have met their low burden of showing that the

proposed class satisfies the commonality requirement of Rule 23(a).

## Typicality/Adequacy

The defendants hotly contest that the claims of the named plaintiffs are typical of the class they propose to represent. They argue this point along with the adequacy requirement of 23(a)(4), thus, the court will address these requirements together

The test for typicality under Rule 23(a)(3) is not demanding. *Mullen*, 186 F.3d at 625. Any variety in the types of injuries suffered by class members that does not affect their legal or remedial theories, does not defeat typicality. *Id.* The typicality requirement "focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Lightbourn*, 118 F.3d at 426. The typicality requirement is met where "the claims arise from a similar course of conduct and share the same legal theory." *Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002).

The plaintiffs argue that they and the members of the proposed class have claims for breach of fiduciary duty and negligence that arise from the alleged self-dealing and incompetent reinsurance decisions the defendants made in the time leading up to Hurricane Katrina. They contend that these claims share precisely the same remedial theory and arise from the same course of conduct, and thus, the plaintiffs easily pass the modest typicality test.

Rule 23(a)(4) provides that a class will not be certified unless the representative parties will fairly and adequately protect the interests of the class. The Fifth Circuit has held:

> [t]he adequacy requirement mandates an inquiry into [1] the zeal and competence of the representative[s'] counsel and ... [2] the willingness and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees[.]

See *Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d at 484, (citations omitted).

The determination of whether the class representative will adequately protect the interests of the class is critically important because the putative class members are bound unless they affirmatively exercise their option to be excluded from the class. See *Berger v. Compaq Computer*, 257 F.3d at 480; and *Albertson's, Inc. v. Amalgamated Sugar Co.,* 503 F.2d 459 (9th Cir. 1974). "Differences between named plaintiffs and class members render the named plaintiffs inadequate representatives only if those differences create conflicts between the named plaintiffs' interests and the class members' interests." *Berger* at 480 (citing *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir.1986) (considering, in evaluating the requirement of adequate representation, whether named plaintiffs have "an insufficient stake in the outcome or interests antagonistic to the unnamed members"; *see also Mullen*, 186 F.3d at 626 (noting that although the differences described by defendant might create variances in the ways that the named plaintiffs and class members prove causation and damages, this did not affect the alignment of their interests))).

The plaintiffs have provided affidavits of their primary counsel indicating their vast and cumulative experience in the class action arena. Their ability and experience is certainly beyond question and the defendants do not attack on this issue. Instead, the defendants highlight perceived conflicts among the named plaintiffs and between the named plaintiffs and the putative class members.

The defendants deny that the plaintiffs are adequate because of what they

characterize as a significant intra-class conflict. This purported conflict arises because Article VII of the MWUA's governing Articles of Agreement provides for the possibility of indemnification by the MWUA of the defendants' damages liability, costs and attorney's fees in this case. Under circumstances enumerated below, the damages awarded to the class, along with the defendants' reasonable costs and expenses and attorneys fees, would be treated as "an expense of the Association" under the indemnification clause in the Articles. Expenses of the MWUA, in turn, are assessed based on the member companies' participation percentage, without a reduction for voluntary writings. (Plan § IX(2)). Thus, according to the defendants, any amount recovered by the plaintiffs on behalf of the class could be assessed back to the members of the class on a pro rata basis.

An analysis provided by one of the defendants' experts shows that several putative plaintiffs (as many as 25) would actually be worse off if the plaintiffs won and indemnification was ordered under the terms of the Plan. The plaintiffs assert that the defendants misinterpret the class as proposed to be defined. The proposed class definition is:

> All members of the Mississippi Windstorm Underwriting Association (—the Association.) on or about August 29, 2005 (other than Defendants and their affiliates) that paid losses assessed in the 90% of losses column set forth in the MWUA Hurricane Katrina assessment.

Thus, according to the plaintiffs, the proposed definition excludes all but five of the MWUA members who could potentially be required to pay more to indemnify the defendants than they would recover through this litigation. Further, the plaintiffs argue that any remaining possibility of intra-class conflict, which would materialize only in the event that MWUA members are required to indemnify the defendants for damages they

caused to those same members after this litigation is complete, can be eliminated if the Court certifies a slightly narrower class. *i.e.*:

> All members of the Association on or about August 29, 2005 (other than Defendants and their affiliates) that bore a greater percentage of losses assessed in the 90% of losses column than they bore in the 10% of losses column set forth in the Third MWUA Hurricane Katrina assessment.

This modified definition, according to the plaintiffs, excludes any MWUA member whose share of an indemnity assessment would outstrip their share of MWUA losses. It would thus exclude every MWUA member that could lose in the event that the plaintiffs recover damages that are indemnified by the MWUA. Accordingly, the plaintiffs assert, it would leave a class with 105 members (down from 110 members, as originally proposed) who paid 87.78% of the unreinsured Katrina losses. All 105 class members would allegedly stand to benefit from a recovery in this litigation, even if the defendants were indemnified by the membership.

The plaintiffs go on to assert that not only does the conflict posited by the defendants disappear in light of an appropriately defined class, it erroneously assumes that the defendants are entitled to indemnification. On the face of the Plan, the defendants can be indemnified only if the acts for which they are held liable were "done or omitted in good faith without intent to defraud and within what [they] reasonably believed to be the scope of his employment or authority and for a purpose which he reasonably believed to be in the best interest of and in connection with the administration, management, conduct or affairs of the Association." (Plan at Article VII). Further, the plaintiffs claim that the defendants' reinsurance decisions were undertaken, not "in good faith" and "in the best interest of" the Association, but in self-interest. Therefore, if plaintiffs prevail on their legal theory contained in Count IV of the

Complaint, they contend that they will be entitled to a declaration that the defendants cannot be indemnified.

If the court were to deny the plaintiffs' request for declaratory judgment, the defendants would presumably request indemnification from the MWUA. Under the Articles of Agreement, any such request would be submitted to the full membership for a vote. (Plan Article VII). The plaintiffs assert that the MWUA's members are unlikely to vote in favor of indemnifying the defendants based on the allegations of self-dealing. In any event, the plaintiffs are correct that any theoretical conflict asserted by the defendants depends upon a variety of circumstances that would only arise in potential future proceedings related to indemnification, not in this litigation, and are not of such consequence as to foil the plaintiffs' showing of their adequacy as representatives of the putative class.

In response, the defendants assert that they could not have been guilty of self-dealing to minimize reinsurance expenses because such expenses were not theirs to bear. However, there is evidence on both sides of this issue and it is hotly disputed by the plaintiffs that the defendants' analysis of the accounting treatment related to reinsurance expenses is correct. That is a disputed question of fact which the court is not equipped to resolve at this time. Indeed, it is an issue which is capable of determination on a class-wide basis as well as in individual suits. Thus, even though the issue is rather convoluted and it is a close question, the presence of such an issue does not appear to diminish the adequacy of the representativeness of the plaintiffs nor the typicality of their claims.

The adequacy requirement also "mandates an inquiry into . . . the willingness

and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees." *Horton v. Goose Creek Indep. Sch. Dist.*, 690 at 484 . The defendants claim that none of the named plaintiffs understands or supports the key allegation in the Complaint that the defendants "acted out of self-interest" in making reinsurance decisions for the MWUA. According to the Complaint, because the defendants were responsible for over 50% of the MWUA's administrative expenses—including the cost of reinsurance premiums—but were responsible for either zero or less than two percent of 90% of the MWUA's unreinsured losses, the defendants made a "self-serving" decision to under-reinsure the MWUA.

However, in deposition testimony, at least two of the 30(b)(6) witnesses of the plaintiffs apparently disclaimed any specific knowledge of self-dealing by the defendants. Thus, according to the defendants, this is additional evidence that the plaintiffs are inadequate representatives of the putative class. But what the defendants ignore is that "[c]ourts have almost universally reject[ed] any challenge to adequacy for class actions under amended Rule 23 based on ignorance of the facts or theories of liability.. . ." 1 Newberg on Class Actions § 3.34 (4th ed.).

The plaintiffs argue that the class representatives understand and support the key allegations in the Complaint but admit that they might not necessarily fully understand the inner workings of the MWUA's accounting practices. However, the court agrees that is not the key question to be resolved in this analysis. Rather, the question is whether the plaintiffs are willing and able "to take an active role in and control the litigation and to protect the interests of absentees." *Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d at 484.

The plaintiffs are capable insurance companies with experienced counsel. They are sophisticated parties who have the resources and personnel to adequately pursue this litigation. They have demonstrated that they are willing and able to manage this litigation and to protect the interests of class members. Thus, their ability as adequate class representatives is not an issue which prevents certification of the putative class.

## REQUIREMENTS OF RULE 23(b)(3)

The plaintiffs are proceeding under Rule 23(b)(3). As a (b)(3) class, the plaintiffs must show predominance and superiority, *i.e.*, that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The rule states that the pertinent inquiry includes; (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

While an analysis of the (b)(3) requirements resembles the analysis of commonality under 23(a)(2), "[t]he predominance and superiority requirements are 'far more demanding' than is rule 23(a)(2)'s commonality requirement." *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 738 (5th Cir. 2003)(quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 624, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)).

In reaching a conclusion on whether legal or factual issues common to the class predominate over individual issues, the court must inquire into how the case will be tried. *See Castano,* 84 F.3d at 744. Such an analysis requires the court to look beyond the pleadings to "understand the claims, defenses, relevant facts, and applicable substantive law." *Id.*

**Predominance**

As stated, "an accurate finding on predominance is necessary before the court can certify a class." *Castano*, 84 F.3d at 749. Deciding whether common issues predominate and whether the class action is a superior method for resolving the controversy requires an understanding of the relevant claims, defenses, facts, and substantive law presented in the case. *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 419 (5th Cir. 1998). "Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination for the certification issues." *Castano*, 84 F.3d at 744 (citation omitted). Further, the district court is required to analyze how the case "would actually be tried" in order to determine if the requirements of predominance and superiority have been proven. *Id.* at 745.

The plaintiffs' predominance argument is essentially a restatement of their commonality argument that resolution of whether the defendants' alleged self-dealing conduct with respect to the purchase of reinsurance prior to Hurricane Katrina violated the defendants' legal duties to the plaintiffs and would affect all members of the proposed class. In order for the plaintiffs to prevail on their claims, they must show that

(1) the defendants owed them a duty, either a fiduciary duty or duty of care; (2) the defendants breached that duty; and (3) the defendants' breach of that duty was the cause of the alleged damages. *Callicutt v. Prof'l Servs. of Potts Camp, Inc.*, 974 So. 2d 216, 221-23 (Miss. 2007); *Peters v. Metro. Life Ins. Co.*, 164 F. Supp. 2d 830, 835 (S.D. Miss. 2001). The defendants assert that trying each of these elements would require individualized inquiries that overwhelm common issues.

As a first line of attack, the defendants assert that the plaintiffs have failed to specifically allege any duty they contend the Board owed to the members themselves. Instead, the defendants argue that any duty owed was to the MWUA itself. However, as the plaintiffs point out, the existence and nature of the defendants' duties in connection with reinsurance decisions arise from multiple sources, equally applicable to all putative class members. The MWUA was empowered by statute "to purchase reinsurance in behalf of its members." Miss. Code § 83-34-5(c) (1987). The statute thus empowered the MWUA to purchase reinsurance "for the benefit of" its members. It did not, however, create a requirement that any such purchase be made.

The Articles of Agreement state that "the assumption and cession of reinsurance on behalf of member insurers" is one of just two "objects of the Association." (Article III). The Plan likewise indicates that the MWUA is authorized "to purchase reinsurance on behalf of its members, provided such reinsurance is authorized by a majority of the Directors." (Plan § IX). Once again, there is an authorization to purchase reinsurance, not a requirement to do so. However, the defendants were arguably in the best position to determine how much reinsurance to purchase for the benefit of the members. They had direct access to information about the MWUA's budgets, portfolio of insured risks,

and catastrophe modeling, and they were exclusively empowered to raise funds necessary to purchase reinsurance by assessing the membership. (Plan § IX ).

The plaintiffs also argue that the defendants' responsibilities as directors of an unincorporated association are "analogous to the responsibility of corporate directors and officers." *Murray v. Sevier*, 993 F. Supp. 1394, 1404 (M.D. Ala. 1997). *See also Kovich v. Paseo Del Mar Homeowners' Association*, 41 Cal. App. 4th 863, 866-867 (1996) (unincorporated association performing "quasi-governmental functions . . . had a fiduciary relationship with the seller and other association members"); *Kelly v. Astor Investors, Inc.*, 462 N.E. 2d 996, 999 (Ill. Ct. App. 1984) ("[T]he officers and directors of a not-for-profit organization stand in a fiduciary relationship to the members of the association."). *See also* Miss. Law of Torts § 17:4 ("Fiduciary duties are often held to arise out of relationships in which one party represents, or is reasonably expected to protect, the interests of another."). The plaintiffs point out that it is widely recognized that "[t]he officers of an association are bound to act for the common interest of all members, should not reap secret profits at the expense of the association, and may be held personally liable for breach of their obligations toward the members of the association." 7 Corpus Juris Secundum § 34 (Associations).

The defendants continue that even assuming that the plaintiffs are able to overcome the individualized inquiry on whether the defendants owed a duty to each member of the proposed class, the plaintiffs will also have to show that the defendants breached that duty. They assert that because the plaintiffs are suing individually—not on behalf of the MWUA—proving the element of breach will present yet another challenge to the predominance requirement. Indeed, the Fifth Circuit observed in

*O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d at 742, that a finding of liability in one circumstance "does not necessitate the conclusion that such unreasonableness exists on a classwide basis." *See also Romano v. Merrill Lynch, Pierce, Fenner & Smith*, 834 F.2d 523, 530 (5th Cir. 1987).

The defendants argue that here, as in *O'Sullivan*, the plaintiffs have provided no basis for imposing on the members of the Board named as the defendants an identical duty to each class member such that a breach as to one compels a finding of breach as to all. They admit that while the determination of "breach" will require consideration of the defendants' actions in reaching the reinsurance decision, they contend that the plaintiffs have failed to show how these acts, while common to all members of the proposed class, predominate.

To support this argument, the defendants contend that proving whether the purchase of $175 million in reinsurance for the 2004 and 2005 hurricane seasons was a breach of duty will necessarily require an examination of the unique circumstances of each member of the proposed class. They assert that a certain level of reinsurance may have been "reasonable" as to one member company, yet "unreasonable" as to another, depending on a number of factors that vary from company to company.

However, the plaintiffs do not allege that the defendants had a duty to obtain what each class member would consider to be optimal reinsurance. They contend instead that the defendants had a duty to consider the interests of all MWUA members, not just the interests of themselves and the other MWUA members who had voluntary writing credits sufficient to insulate them against any catastrophe assessment.

The court cannot conclude that there would be a necessity for multiple

individualized findings on the duty/breach of duty issues. It appears more likely that the issues of duty and breach of duty run to the class as a whole. That being said, it is apparent that there are significant questions of law and fact common to the members of the class which would likely predominate over any questions affecting only individual members as far as duty/breach of duty.

However, as far as the defendants' argument that individual reliance would be an issue in the causation analysis, the court concludes that it is troubling. While it is necessary to show reliance in a typical fraudulent misrepresentation case, reliance is not an issue in a negligent breach of fiduciary duty case. *See, e.g., Miss. Dept. of Mental Health v. Hall*, 936 So.2d 917, 922 (Miss. 2006) (negligence requires proof of duty, breach, causation and injury); *Peters v. Metro. Life Ins. Co.*, 164 F. Supp. 2d 830, 835 (S.D. Miss. 2001) ("The elements of a claim for breach of fiduciary duty are (1) a fiduciary relationship, and (2) its breach.").

However, to the extent that reliance proves to be an issue arising out of any intentional or fraudulent conduct on the part of the defendants "[r]equiring proof of individualized reliance from each member of the proposed plaintiff class effectively would . . . prevent[] . . . proceeding with a class action, since individual issues then would . . . overwhelm[] the common ones." *Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988). Further, the Fifth Circuit has held "cases that involve individual reliance fail the predominance test." *Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co.*, 319 F.3d 205, 219 (5th Cir. 2003)

The defendants are correct that no statute or rule cited by the plaintiffs required all member companies to rely upon the Board to purchase adequate reinsurance. Further, heightening the individualized nature of causation and reliance is that the

amount of information known to each individual member company likely varied. This would eliminate any potential generalizations that could be made as to their knowledge of the adequacy of the reinsurance obtained by the MWUA in 2004. *See In re Elec. Data Sys. Corp. "ERISA" Litig.,* 224 F.R.D. 613, 630 (E.D. Tex. 2004).

By way of example, the defendants point to documents produced by the plaintiffs in this case which show that Association Casualty and Georgia Casualty received a copy of the minutes from the MWUA's Seventeenth Annual Membership Meeting, which took place on October 15, 2004. The Chairman's Report, which was made part of the minutes, stated, in part, as follows:

> The current insurance in force is over $1.6 billion, which is an all time high. This represents a 23% increase over last year's 26% increase from the previous year. During the past year, the MWUA reviewed its reinsurance program by soliciting proposals from several brokers, and the decision was made to continue using CRC. Due to some softening in the reinsurance market, the MWUA was able to purchase 100% of $175 million of coverage.

These same documents show that, in contrast, National Security only monitored its participation percentages and relates that it did not know if it ever reviewed minutes from the MWUA's annual meetings. The defendants are correct that at trial, if the class is certified, the defendants will be entitled to undercut the plaintiffs' proof of causation by showing that an individual member company knew about the reinsurance purchased in 2004, understood the bases for that decision, recognized the MWUA's potential exposure, and yet would have made the same decision at the time. Proof of causation at trial, therefore, will, in this scenario, be individualized, predominating any common issues of fact in this regard.

The plaintiffs' theory that the defendants negligently breached a duty owed to them to purchase reinsurance would not require reliance. But, to the extent that the

plaintiffs attempt to show intentional self-dealing, causation becomes problematic. Intentional untoward acts of the kind the plaintiffs have alleged on the part of the defendants approaches fraudulent conduct. In fact, the plaintiffs argue that the alleged self-dealing rose to a level which would avoid an order of indemnification for the defendants under the Plan. The Plan requires a lack of good faith or fraudulent conduct to avoid such a requirement of indemnification.

Thus while it appears overall that substantial common issues of law and fact related to the duty/breach of duty issues likely predominate over individualized ones issues of causation become much more individualized when the issue of self-dealing to the point of bad faith or fraud enters the equation. At this early stage without a fleshing out of the plaintiffs' claims and the contrasting defenses of the defendants, this is a close question. However, the burden remains on the plaintiffs to convince the court that the requirements of Rule 23 have been met. They have not on this issue.

**Superiority**

One of the primary considerations for finding that any particular action is more suitable for class treatment, *i.e.*, that class treatment is a superior method of deciding contested issues, is that similar cases have been tried to completion as individual cases in state of federal courts. In other words, the causes of actions have "matured" to the point that issues of duty, breach and causation and the defenses thereto have been fleshed out in numerous and varied forums so that there is a track record for the court attempting to try a class case to judge the import of the relative issues. There has been no litigation of this specific kind of claim in circumstances similar to that presented in this case.

The plaintiffs argue that all issues presented point to the superiority of class treatment. However, the court has found that the plaintiffs failed to convince the court on the first requirement of Rule 23(a) - numerosity. On that issue, the court has found that the plaintiffs have not met their burden of showing that the number of putative class members is so numerous as to make their joinder impractical. The court has also found that the plaintiffs failed to show predominance as stated above based on the self-dealing aspect of the plaintiffs' claims.

Each of the plaintiffs and each of the putative class members is a sophisticated entity. They have the resources and personnel to research, discuss and make critical decisions regarding whether or not they participate in this litigation. As stated before, several potential class members have apparently been contacted in an effort to encourage them to intervene in this action and, thus far, they have declined to do so. One named plaintiff even voluntarily dismissed its claims.

These facts obviate the plaintiffs' contentions that some of these cases are of "negative value", *i.e.*, that it will cost more to litigate them than can be expected in recovery. That simple fact standing alone may very well be true. However, these putative plaintiffs are not the typical "Joe" on the corner trying to pursue expensive litigation while trying to figure out how to pay for it. These are sophisticated and knowledgeable companies making economic decisions. Any argument that the so-called "negative value" of these claims contributes to the superiority of trying them on a class basis falls on deaf ears.

The defendants also argue that there are novel legal issues which counsel against the superiority of class treatment. The court agrees that this litigation fairly bristles with novel and even thorny legal issues. This argument goes back to the

relative "maturity" of these types of claims. However, the court cannot say that such an argument alone would significantly contribute to a conclusion that class treatment is not the superior method of trying these issues. Mississippi law controls on all issues and thus sticky choice of law problems are avoided. Wherever and however the cases are tried, they will be breaking new ground until a track record is established.

The court has concluded that the claims of the named plaintiffs, while still quite convoluted, appear to be fairly common and typical of the claims of the class. However, there are numerous factual and legal issues to be decided as this case develops and the defenses are presented. While most of these issues would be decided on a class basis, class treatment would likely complicate and multiply these thorny issues. The court has struggled mightily with the predominance issue. Depending on how the case progresses, it may very well be that individual issues predominate over class ones.

Ultimately, the burden is on the plaintiffs to show that class treatment is appropriate. With the failure of the plaintiffs to show numerosity and with the questionable showings regarding predominance, the court simply cannot conclude that class treatment is the superior method of trying the issues presented in this litigation.

The plaintiffs have- failed to prove that their claims meet the requirements of Rule 23. Accordingly, the plaintiffs' Motion for Class Certification **[#168]** is DENIED.

SO ORDERED AND ADJUDGED, this the 29th day of July, 2008.

*s/Keith Starrett*
UNITED STATES DISTRICT JUDGE